# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
|     **Plaintiff,** | Case No. 2:12-CR-54 |
| v. | Judge Peter C. Economus |
| **ROBERT DUANE WALKER,** | **OPINION AND ORDER** |
|     **Defendant.** | |

This matter is before the Court for consideration of Defendant's Motion to Suppress. (Doc. # 14.) The government filed a response (doc. # 16), and an evidentiary hearing was held on May 1, 2012. Thereafter, the parties submitted post-hearing briefs, which this Court has reviewed. For the following reasons, Defendant's motion is **GRANTED**.

## I. FACTS

On February 21, 2009, during the early morning hours, a van passed Columbus Police Department Sergeant Dana Norman who was travelling westbound on Interstate I-70. At that time, Sgt. Norman was "just driving around" to "see what[ was] going on" around the city. (Tr. page 67.) Although uncertain of his own speed, Sgt. Norman believed the van to be speeding, and he notice that the van cut sharply in front of him to make the exit at Livingston Avenue. (*Id.*, page 68.) Sgt. Norman had not received any calls about the van, nor did he hear any calls about the van over the police radio, but he elected to follow the van on the bases of its speed and what appeared to him to be a hasty exit. (*Id.*, page 70.) His "first thought was this van, whoever was driving this vehicle, was probably a good possibility of being a drunk driver by driving that erratic." (*Id.*, page 71.) The "erratic" driving, according to Sgt. Norman, was the undetermined rate of speed and its exit "off of the freeway down that ramp down to Livingston Avenue[.]"

> Well, this van is either involved in – it's either – The first possibility of thought would be drunk driver, or being the fact that I'm involved in homicide investigations, this van *could* have been involved in some type of activity, at that time of morning, a shooting, fleeing from somebody. *I have no idea*.

(*Id.*, page 71; *see also,* pages 88-89; emphasis added.) Sgt. Norman later testified that he did not know of any criminal activity related to the van or its driver, only that he suspected a traffic violation had been committed. (Tr., page 86-87.)

Sgt. Norman continued to follow the van down Livingston Avenue and down several side streets. He testified that the van was "definitely speeding more than 35 miles an hour, going back and forth across the lanes in traffic." (*Id.*, page 72; *see also* page 91, "I don't know how fast he was going down Livingston Avenue. It was more than 35 miles an hour.") Because Sgt. Norman was in an unmarked car, he was not able to stop the van, so he contacted uniformed officers over the police radio. (*Id.,* page 73.) As he followed the van down Heyl Avenue, he radioed again, noting that the van was navigating through the narrow Heyl Avenue where cars were parked on both sides. (*Id.*, page 73.) He radioed two more times as he continued to follow onto various side streets. (*Id.*, pages 75-79.) Eventually, he stopped on Whittier Avenue where the van was parked. (*Id.*, pages 78-79.) There, Sgt. Norman saw the driver exit the van and go up on the porch of 815 Whittier Avenue.[1] Even though Sgt. Norman testified that he did not know that any criminal activity had transpired, he "tried to stop [Defendant] from eluding the police." (*Id.*, page 86.) Sgt. Norman got out of his car, followed the driver onto the porch, and verbally identified himself as a police officer while holding open his coat to show the police

---

[1] The residence at 815 Whittier Avenue belongs to Defendant's mother and is where he frequently stays and where, that night, his daughter was visiting. (Tr., page 36.)

badge on his belt buckle.[2] The driver, later identified as Defendant Robert Walker, did not stop; instead, he jumped over the porch railing and ran behind the house. (*Id.*, page 85.) Defendant testified that although he had noticed a white car following him soon after he exited onto Livingston Avenue, he did not know the driver was a police officer. (*Id.* at pages 40-48.) Sgt. Norman followed and grabbed Defendant by the back of his coat. Defendant pulled away and continued behind the house. At this point, uniformed officers appeared on the property, and they tasered, handcuffed and arrested Defendant. (*Id.,* page 99, 115.) Defendant was searched, and a uniformed officer found a handgun in Defendant's pocket. (*Id.*, pages 115-16.) All of these events took place at 815 Whittier Avenue.

## II. FOURTH AMENDMENT

The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### A. Seizure

In *Terry v. Ohio*, the Supreme Court noted, "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U.S. 1, 18 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n. 16. "[I]n order to determine whether a particular encounter constitutes a

---

[2] In its post-hearing memorandum, the government describes Sgt. Norman as wearing a "cotton shirt and tie." (Doc. # 22, page 5.) In fact, Sgt. Norman testified, "I had a coat on, a heavy coat on, and a vest. And I just flung my coat back like this to show that I had a badge on." (Tr., page 84.)

seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 438 (1991).

There can be no dispute that Sgt. Norman never effected a traffic stop—nor intended to, conceding he could not have, as he was a homicide detective in plain clothes and in an unmarked cruiser. Therefore, no seizure occurred as the result of a traffic stop. However, once Sgt. Norman approached Defendant on the porch and attempted to detain him, a seizure did occur, from that point and throughout the subsequent tangle with the uniformed officers. Sgt. Norman testified that he saw Defendant exit his van and followed him up the steps to 815 Whittier Avenue. Sgt. Norman ran up behind him, loudly identifying himself as a police officer and holding open his coat to show his badge. He ordered Defendant to stop several times. When Defendant did not stop and, instead, ran to the back of the house, Sgt. Norman "approached him, grabbed a hold of the back of his coat, told him to stop." (Tr. page 86.) Therefore, this Court concludes that a reasonable person would believe that he was not free to "terminate the encounter" with the police. As a result, the encounter between Sgt. Norman and Defendant constituted a seizure. Certainly, when the uniformed officers appeared on the scene and tasered and handcuffed Defendant, he was "seized" within the meaning of the Fourth Amendment. Consequently, was there justification, unrelated to a traffic stop, for the officers to approach and detain Defendant?

### B. Reasonable suspicion

"[A] police officer may stop an individual, question him, and perform a carefully limited pat down search for weapons where the officer reasonably concludes that criminal activity may

4

be afoot." *United States v. Harris*, 192 F.3d 580, 584 (6th Cir.1999) (*citing Terry*, 392 U.S. at 30). However, "[that] police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The Court must give "due weight . . . not to [an officer's] inchoate and unparticularized suspicion or 'hunch' but to the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of [that officer's] experience." *Id*. at 27. *See also United States v. Cortez*, 449 U.S. 690, 695 (1981) (holding that a police officer must justify a stop with "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.") (citations omitted).

While reasonable suspicion is a less demanding standard than probable cause, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In assessing the reasonableness of the stop, a court must assess the totality of the circumstances "to see whether [the officer had] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

### III. WERE THERE FACTS WITHIN THE POLICE OFFICERS' KNOWLEDGE TO SUPPORT EITHER PROBABLE CAUSE OR A REASONABLE SUSPICION OF CRIMINAL ACTIVITY?

#### A. Sgt. Norman

##### 1. *The Alleged Traffic Stop*

The Court finds that Sgt. Norman was unable to provide specific or articulable facts to warrant his attempt to detain and question Defendant. According to Sgt. Norman's testimony, only two facts led him to his *initial* suspicion, *i.e.,* that Defendant had violated a traffic law: (1) Defendant's passing him on the interstate, and (2) Defendant's cutting over and exiting quickly

5

at the Livingston Avenue exit. Incontestably, there are no other facts to expand Sgt. Norman's primary hunch into a reasonable suspicion of criminal activity. Even if Defendant were seized pursuant to a traffic stop, as the government argues, this case is distinguishable from the case law cited by the government. In those cases, the police officers observed drivers crossing double yellow lines, hitting other vehicles, running onto curbs, and so on. Here, Sgt. Norman offered no factual basis other than Defendant's *possible* speeding and his changing lanes.[3] In addition, although Sgt. Norman later speculated that Defendant was driving under the influence of alcohol, he offered no factual basis to support his assumption. Again, unlike the officers in the case law offered by the government, Sgt. Norman did not verbalize any of the typical indicia of drunkenness. Therefore, Sgt. Norman did not have a reasonable suspicion of criminal activity except vague notions of alleged traffic violations. There is no more compelling evidence than Sgt. Norman's admission that he had "no idea." (Tr., page 71.)

### 2. *On The Porch*

Similarly, Sgt. Norman had no factual basis to justify his detention of Defendant at the 815 Whittier Avenue residence. His testimony of his reasoning for pursuing Defendant up the steps is telling:

> Q. What was your purpose, sir, for approaching this individual?
>
> A. I didn't know what had transpired other than the obvious traffic violations that I had observed. And I was waiting for a patrol to show up. I didn't know what he had been involved in whether he had been involved in some criminal activity or something, was fleeing from who knows what. I was trying to stop him from eluding the police. . . .

---

[3] In fact, Sgt. Norman never testified that Defendant's lane changes were illegal, only that Defendant changed lanes frequently.

6

| THE COURT: | So you had no other reason to approach the defendant? You just said that? |
|---|---|
| THE WITNESS: | I had no other reason because I just – his traffic violations he committed, I was a witness to that. And he proceeded to flee down Heyl Avenue. |

(Tr., pages 86-87.) In support of the propriety of Sgt. Norman's investigatory stop of Defendant, the government points to several factors: the activity occurred in the early-morning hours, Defendant was speeding, and the van was "weaving." (Post-Hearing Brief, doc. # 22, page 16.) As this Court previously determined, Sgt. Norman's perception is simply not enough. The Fourth Amendment requires at least a minimal level of objective justification for making an investigatory stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). The government also points to Defendant's refusal to stop as confirming Sgt. Norman's suspicions and "impeding" his investigation. (Post-Hearing Brief, page 17). The issue, though, is whether Sgt. Norman had a proper basis to stop Defendant at the time the encounter on the porch began— not based on what happened thereafter. *See United States v. Martin*, 289 F.3d 392, 397 (6th Cir. 2002) ("This Court evaluates the legitimacy of the investigative stop by making a two-part assessment of its reasonableness. First, the Court must determine whether there was a proper basis to stop the individual based upon the officer's awareness of specific and articulable facts which gave rise to a reasonable suspicion.")

### B.  Uniformed Police Officers

Because Sgt. Norman's attempted stop and detention of Defendant was in violation of the Fourth Amendment, the uniformed officers' subsequent detention and search of Defendant were violative of Defendant's rights, as well. Those officers responded to Sgt. Norman's radio calls,

7

and they formed no independent belief of criminal activity, only that which they heard from Sgt. Norman when he radioed in. Thus, the Court finds that the officers relied on information that was not particularly suspicious.

## IV.     CONCLUSION

Accordingly, insofar as the government has failed to articulate "a particularlized and objective basis for suspecting legal wrongdoing" for stopping Defendant, *United States v. Arvizu,* 122 U.S. 744, 750 (2002), Defendant's Motion to Suppress (doc. # 14) is hereby **GRANTED**, and the handgun seized from Defendant's person must be excluded. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

**IT IS SO ORDERED.**

**/s/ Peter C. Economus**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**